IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| PAULETTE M. PHILLIPS, ) | |
| ) | Case No. 3:08-00660 |
| *Plaintiff*, ) | Judge Nixon |
| ) | Magistrate Judge Griffin |
| v. ) | |
| ) | |
| THE GUARDIAN LIFE INSURANCE ) | |
| COMPANY OF AMERICA, ) | |
| ) | |
| *Defendant*. ) | |

## ORDER

Pending before the Court is Plaintiff, Paulette M. Phillips' ("Mrs. Phillips"), Motion for Judgment on the Administrative Record ("Plaintiff's Motion") (Doc. No. 21) and Memorandum in Support of Plaintiff's Motion (Doc. No. 22), to which Defendant, The Guardian Life Insurance Company of America ("Guardian"), has filed a Response in Opposition (Doc. No. 27). Plaintiff then filed a Reply (Doc. No. 28). Also pending before the Court is Defendant's Motion for Judgment on the Administrative Record ("Defendant's Motion") (Doc. No. 23), to which Plaintiff has filed a Response in Opposition (Doc. No. 26), after which Defendant filed a Reply (Doc No. 31).

### I. BACKGROUND

#### a. Factual background[1]

##### i. The Plan

Mrs. Phillips was employed as a clinical director by THA Group, Inc., doing business as Island Health Care ("Island") in Savannah, Georgia from November 6, 2006 to April 20, 2007. AR at 385. As an employee of Island, Plaintiff was a participant in an employee welfare benefits

---

[1] "AR at __" refers to the Administrative Record, pages AR00001-AR00803.

plan ("the Plan"). (Doc. No. 1.) This Plan was issued by Guardian, an insurance company. (Doc. No. 22 at 1.) The Plan entitles eligible disabled participants, as defined in the Plan, to both short-term and long-term disability benefits. AR at 78-108. To be eligible for both short-term and long-term benefits, a claimant must become disabled while insured by the Plan and remain disabled for the Plan's elimination period. AR at 78, 91. Further, the claimant must be under a doctor's care for the cause of the disability and must have written proof of the disability, weekly earnings prior to the disability, and earnings while disabled. *Id.*

To qualify as "disabled" for short-term or long-term disability benefits, "a covered person has physical, mental or emotional limits caused by a current *sickness* or *injury*. And, due to these limits, he or she is not able to perform, on a full-time basis, the major duties of his or her *own job*." AR at 85, 104 (emphasis in original). The Plan defines "own job" as the "covered person's job for the employer." AR at 86. The description of Plaintiff's job provided by her employer states that her job requires the following per day on average: sitting for five hours, standing for four hours, walking for three hours, and driving for one hour. AR at 322. Further, the average workday requires bending and stooping frequently, and occasionally requires the employee to kneel, crouch, push or pull ten pounds and lift twenty pounds. *Id.*

Under the Plan, an employee's insurance terminates automatically "if his employment terminates" and "[t]ermination of employment shall be deemed to occur when the Employee ceases active service on a full-time basis with his Participating Employer," except to the extent this requirement was modified in the employer rider. AR at 34. Furthermore, "an employee's short term insurance under this plan will end on the first of [a range of] dates," including "the date an employee's active full-time service ends for any reason." AR at 76. However, the Plan

provides that "if an employee is disabled, as defined by this plan when his or her active full-time service ends, coverage remains in force during" certain periods not contested by the parties. *Id*.

The Plan also grants Guardian discretion to "decide: (a) if a covered person is eligible for this insurance; (b) if a covered person meets the requirements for benefits to be paid; and (c) what benefits are to be paid by this plan. We also interpret how this plan is to be administered." AR at 78.

### ii. Plaintiff's claim for benefits under the Plan

On March 20, 2007, Plaintiff submitted a resignation letter to Island Health Care. AR at 386. In the letter, she stated that she would be resigning effective May 1, 2007, because she and her husband had decided to relocate to Tennessee to be closer to their families. *Id.* On April 20, 2007, however, she terminated her employment early. AR at 387. Her Notice of Separation indicated that an old back condition started causing Plaintiff pain and her physician had suggested that she leave immediately. *Id*.

Prior to working for Island Health Care, Mrs. Phillips had a lumbar laminectomy and a fusion on May 8, 2005, performed by Dr. Bradley Heiges. AR at 198-99. After the surgery and a few follow-up visits, Plaintiff did not see the doctor again for nearly two years. *Id.* However, on March 7, 2007, Plaintiff returned to Dr. Heiges complaining of back discomfort and bilateral hand numbness. AR at 217. New radiographs obtained by the doctor indicated "spondylosis of the central disc spaces with very slight kyphotic changes." *Id*. Dr. Heiges indicated in his notes that he believed the issue "will likely resolve with some time," they were "going to try some anti-inflammatory medications," and recommended home exercise. *Id*.

On April 13, 2007, Mrs. Phillips returned to Dr. Heiges after an MRI study claiming that she was having "a little bit worsening pain." AR at 216. Dr. Heiges indicated that he believed

3

her changes at her L3-4 and L5-S1 vertebrae were related to her bilateral L5 stenosis, and that "she has still clinically sacroiliac inflammation." *Id*. The doctor suggested an SI[2] joint injection to determine if this would relieve the pain. *Id*. On April 18, 2007, she returned to Dr. Heiges for a follow-up after receiving an SI joint injection. AR at 215. The doctor indicated that "[s]he feels she has had significant relief from this injection with almost complete resolution of her pain." *Id*. He also stated that they would continue to monitor Mrs. Phillips' symptoms, she would continue to use the anti-inflammatory medication, and she would contact his office if her symptoms returned. *Id*.

On April 20, 2007, Plaintiff indicated to Island Health Care that she was terminating her employment, eleven days prior to the resignation date set out in her March 20 letter. In the Notice of Separation, the "Supervisor/Director Notes" section stated that Plaintiff was "[d]ue to leave May 1st to move to Tenn. Old back condition started causing her severe pain. Her physician suggested she leave immediately." *Id*. Also on April 20, she initiated a claim with Guardian for short-term and long-term disability benefits. AR at 391-92. In her letter to Guardian requesting benefits, Plaintiff claimed that she had been diagnosed with spinal stenosis in the cervical spine. AR at 391. She also stated that she had been "diagnosed with (1) spondylolisthesis (subluxation), (2) degenerative arthritis of the lumbar facets ad sacroiliac joints, (3) severe degenerative disc disease with dessication, fissures and annular bulging[, and] (4) severe central and lateral canal stenosis." *Id*. Plaintiff claimed that these conditions were causing her severe pain to the point she was unable to continue working. *Id*.

---

[2] SI refers to the sacroiliac joint in the lower back.

On August 10, 2007, Guardian issued a denial letter stating that after review of Plaintiff's medical records by a medical specialist, "the records do not support total disability."[3] AR at 368. Specifically, Guardian mentioned Plaintiff's visit to her physician, in which Dr. Heiges indicated that "[Plantiff] had significant relief from the injection with almost complete resolution of pain." *Id*. Guardian also stated that "[t]here is no indication of why you are unable to work and not clear what your restrictions are and follow-up is only as needed." *Id*.

After moving to Tennessee, Plaintiff underwent a neurosurgical evaluation on October 3, 2007, by Dr. Peter M. Klara, an orthopedic surgeon. AR at 219. Dr. Klara indicated in his notes that Plaintiff was complaining of "radiation into the left anterolateral thigh on an intermittent bases" and "standing, stooping, lifting or sitting for extended periods of time exacerbate her problem." *Id*. Dr. Klara reviewed x-rays taken during the visit and found "loss of disk height at 3-4 with retrolisthesis of 3 on 4 as well as 2 on 3." AR at 223. The doctor also indicated that there was "moderately severe degenerative disease." *Id*. Dr. Klara determined additional investigation was warranted, and on October 10, an MRI was performed. AR at 221.

After reviewing the MRI, Dr. Klara's impression was that Plaintiff had "moderate disk protrusion C6-7 with mild spinal stenosis" and "moderate disk protrusion C5-6 posterior to the right with mild spinal stenosis." *Id*. In addition, Dr. Klara indicated that Plaintiff had "severe degenerative stenosis right and left C5-6 neural foramina." *Id*. During the month of October 2007, Plaintiff underwent physical therapy at Results Physiotherapy as prescribed by Dr. Klara. AR at 299-300, 326-32.

On November 14, 2007, Plaintiff met with Dr. Klara again. AR at 192. Again, the doctor's impression was that Plaintiff had "cervical degenerative disease." *Id*. However, she

---

[3] Guardian specifically denied Mrs. Phillips' claim for short-term disability benefits. The definition of "disabled" is, however, the same for short-term or long-term disability benefits. AR at 85, 104.

5

found "no evidence of progressive neurological deficits" and recommended continued conservative treatment through physical therapy and nonsteroidal anti-inflammatories. *Id*. The doctor stated that "[Plaintiff] can be followed up on a p.r.n. basis unless problems arise." *Id*.

On September 26, 2007, Dr. Heiges filled out a medical opinion form. AR at 212-14. On this form, Dr. Heiges stated that Plaintiff could only be expected to sit for one to two hours per day, stand or walk one to two hours per day, lift/carry one to five pounds occasionally, one to ten pounds infrequently, and never carry anything above eleven pounds. AR at 212. Dr. Heiges also stated that Plaintiff's complaints seemed reasonable, that her pain would cause lapses in concentration or memory on a regular basis, and that she had a reasonable medical need to be absent from full-time work on a chronic basis. AR at 213-14.

On December 28, 2007, Dr. Heiges filled out an attending physician's statement. AR at 210-11. He listed his diagnosis of Plaintiff's condition as "Lumbar Spinal Stenosis" and indicated that his course of treatment included an SI injection, epidural injections, and Lodine (a nonsteroidal anti-inflammatory drug). AR at 211. He also listed Plaintiff's progress as "unchanged" and that he had placed Plaintiff on "off work" status as of April 20, 2007. *Id*. He further indicated that Plaintiff had "severe limitations of functional capacity, incapable of minimal (sedentary) activity (75-100%)" and listed Plaintiff's anticipated date of release to return to work as "unknown."

On January 29, 2008, Plaintiff notified Guardian of her appeal to Guardian's denial and requested an additional sixty days to obtain additional evidence of Plaintiff's disability. AR at 336. In addition to the other medical evidence, Plaintiff submitted a sworn statement provided by Dr. Heiges that was taken via telephone on February 19, 2008. AR at 196-209. In the sworn statement, Dr Heiges states that Plaintiff's condition was caused by stenosis and "spinal stenosis

will incrementally worsen over time." AR at 201-02. He also stated that stenosis will cause pain because it causes compression of nerve roots. AR at 204. He further indicated that "[Plaintiff's] medical problems are competent producers of physical limitations and restrictions" and she could not "be reasonably expected to be reliable in attending an eight-hour day, 40-hour workweek." AR at 206. Plaintiff also submitted a report by Mark Boatner, a vocational expert. AR at 232-41. In his report, Mr. Boatner stated that "[Plaintiff] would not be capable of sustaining her own past relevant work or any other full-time work to which her job skills might otherwise transfer as a direct result of her medically determinable impairments." AR at 232.

After reviewing the additional evidence submitted by Plaintiff, Guardian determined there was no new medical evidence to change their opinion and issued a second denial by letter on April 17, 2008. AR at 10-11, 177-81. In the denial letter, Guardian stated that the medical evidence did not support her claim that she was unable to perform the duties of her own job and Mrs. Phillips had made a personal choice to stop working. AR at 177. In addition, Guardian stated that Plaintiff's medical record did not indicate any limitations or restrictions preventing her from working. AR at 180. Guardian also stated that Ms. Phillips was instructed by her physician to contact his office if her symptoms returned after her visit on April 18, but did not contact Dr. Heiges until September 21 indicating that her condition had been resolved. *Id.* Guardian further stated that Plaintiff's disability coverage under the Plan ended on April 20, 2007, because she was no longer working on a full-time basis at that time. AR at 179. Furthermore, Guardian stated that Plaintiff had exhausted all of her administrative remedies under the Plan. AR at 181.

### b. Procedural background

Plaintiff filed this action on July 3, 2008, pursuant to the Employee Retirement Income Security Act ("ERISA") § 502, 29 U.S.C. § 1132, to obtain judicial review of Guardian's denial of her claim for disability benefits. (Doc. No. 1.) On January 15, 2010, Plaintiff filed a Motion for Judgment on the Record (Doc. No. 21) along with a Memorandum in Support (Doc. No. 22). Guardian filed its own Motion for Judgment on the Record (Doc. No. 23) and Memorandum in Support (Doc. No 24) on January 15 as well. Subsequently, Plaintiff filed a Response in Opposition (Doc. No. 26) to Guardian's Motion on February 15, 2010 and Guardian filed a Response in Opposition to Plaintiff's Motion (Doc. No. 27) on the same day. On March 3, 2010, Plaintiff filed a Reply (Doc. No. 28) to Guardian's Response, and Guardian then filed a Reply (Doc. No. 31) to Plaintiff's Response on March 4, 2010.

## II. STANDARD OF REVIEW

### a. Arbitrary and capricious review

The Supreme Court determined that when a denial of benefits is challenged pursuant to § 1132(a)(1)(B), the denial is to be reviewed under a *de novo* standard. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). However, if the plan administrator was given discretion in the plan documents to construe the terms of the plan or determine eligibility for benefits, then arbitrary and capricious review is the proper standard and the administrator's decision is entitled to deference. *Id.* If the administrator is operating under a conflict of interest, that conflict must be weighed as a "facto[r] in determining whether there is an abuse of discretion." *Id*. (quoting Restatement (Second) of Trusts § 187, Comment *d* (1959)).

The Court has stated that *Firestone* does not imply a change in the standard of review from deferential to *de novo* when the administrator operated under a conflict of interest; instead,

the Court has interpreted the word "factor" to imply that a conflict of interest is one of several considerations a judge must take into account when reviewing the lawfulness of an administrator's denial of benefits. *Glenn v. Metro. Life Ins. Co.*, 554 U.S. 105, 115-17 (2008). The Sixth Circuit has explained that when there is a conflict of interest, a court should conduct a more searching review of the administrator's decision, but arbitrary and capricious review remains the proper standard. *Schwalm v. Guardian Life Ins. Co. of Am.*, 626 F.3d 299, 311-12 (6th Cir. 2010).

This Court finds that the Plan in the present case properly gives the administrator discretion to construe the terms of the Plan and to determine eligibility under the Plan.[4] The Plan states in part:

> We decide: (a) if a covered person is eligible for this insurance; (b) if a covered person meets the requirements for benefits to be paid; and (c) what benefits are to be paid by this plan. We also interpret how this plan is to be administered.

AR at 78. The Plan gives Guardian discretion to determine eligibility under the Plan and how the Plan will be administered. Thus, the administrator's denial of benefits in the instant matter must be reviewed under an arbitrary and capricious standard.

However, Guardian was acting under a conflict of interest because Guardian both funds and administers the plan. In *Killian v. Healthsource Provident Adm'rs, Inc.*, the Sixth Circuit determined that Healthsource both funded and administered the plan at issue. 152 F.3d 514 (6th Cir. 1998). The court in that case held that this was an "actual, readily apparent conflict here, not a mere potential for one." *Id.* at 521. Similarly, Guardian both funded and administered the plan at issue in this case. Therefore, this Court finds that Guardian was operating under a conflict of

---

[4] Plaintiff initially asserted that the Plan documents do not grant discretion, and any purported grant of discretion was not sufficient. (Doc. No. 1.) Plaintiff later conceded this issue: "Here, plan documents do include a grant of discretion." (Doc. No. 22 at 11.)

9

interest and this Court must consider this conflict of interest when determining whether the administrator's decision was arbitrary and capricious.

### b. Weight to be given to the conflict of interest

A conflict of interest alone does not require a court to find that the administrator's decision is arbitrary and capricious; the conflict is merely a factor a court must consider. It is for the judge to decide how much weight to give this factor depending on the circumstances of the case. *Canada v. Am. Airlines, Inc.*, No. 3:09-0127, 2010 U.S. Dist. LEXIS 130587, at *61-62 (M.D. Tenn. Aug. 10, 2010). The Supreme Court has further stated that a conflict of interest "should prove more important where circumstances suggest a higher likelihood that it affected the benefits decision" and "should prove less important (perhaps to the vanishing degree) where the administrator has taken active steps to reduce potential bias and to promote accuracy." *Glenn*, 554 U.S. at 117.

Plaintiff argues that the conflict was more likely to have affected the administrator's decision because Guardian had an incentive program in place that provided claim handlers bonuses based on several criteria, including "profitability," and upper management also set a "loss ratio" target each year for the claim handlers. (Doc. No. 22 at 13.) Plaintiff claims that this program gave the employees a "direct financial incentive to deny claims." *Id.* Defendant counters that the maximum bonus under the incentive program was only four percent of the employee's salary, only one percent of the bonus was tied to year-end loss ratios, and the latter figures were not tied to an individual claim handlers' performance. (Doc. No. 27 at 14.) Furthermore, the remaining three percent of the bonus was tied to criteria such as the individual claim handler's productivity, accuracy, and expediency. Thus, Defendant argues, the conflict of

interest should be given little weight because the program more heavily emphasized accuracy rather than profitability. (Doc. 27 at 13-14.)

Although Guardian operated under a conflict of interest, the circumstances do not suggest a high likelihood that the conflict affected the decision to deny benefits. The incentive program may have incentivized the handlers to prevent losses, but the program put a higher value on accuracy and productivity. Only a small portion of the bonus was tied to the loss ratio, while a greater portion was measured by the individual's productivity, accuracy, and expediency. Furthermore, the bonus was only four percent of the employee's base salary and only one percent of the possible four percent was based on the loss ratio. Thus, the incentive to deny a claim solely to prevent a loss was by no means overwhelming. Although the conflict of interest must be taken into account when reviewing the administrator's decision for abuse of discretion, this Court will not give the conflict a great deal of weight because the circumstances do not suggest that it was highly likely to have affected the decision to deny the claim for disability.

### III. ANALYSIS

The Sixth Circuit has stated that "'[t]he arbitrary and capricious standard is the least demanding form of judicial review of administrative action. When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious.'" *Hunter v. Caliber System, Inc.*, 220 F.3d 702, 710 (quoting *Davis v. Ky. Fin. Consol. Retirement Plan*, 887 F.2d 689, 693 (6th Cir. 1989)). When applying the arbitrary and capricious standard, the administrator's decision will not be overturned so long as the denial of benefits was "rational in light of the plan's provisions." *Miller v. Metro. Life Ins. Co.*, 925 F.2d 979, 984 (6th Cir. 1991).

In its final denial letter to Plaintiff, Guardian stated that benefits were being denied because the evidence did not support her claim that she was unable to perform the duties of her job and that, instead, she had made a personal choice to stop working. AR at 177. Plaintiff claims this decision was arbitrary and capricious for several reasons. First, Plaintiff asserts that she is medically disabled as defined under the short-term and long-term disability policies in the plan. (Doc. No. 22 at 14.) Second, Plaintiff asserts that Guardian focused primarily on Plaintiff's resignation letter and did not properly consider the medical evidence. *Id.* at 17. Finally, Plaintiff argues that Guardian's exclusive reliance upon the single opinion of a "non-examining, file reviewing nurse" was an inadequate basis for denying disability benefits. *Id.* at 20.

### a. Guardian's determination that Plaintiff was not qualified for disability benefits the Plan was not unreasonable

Under the Plan, a disabled person is one who "has physical, mental or emotional limits caused by a current sickness or injury. And, due to these limits, he or she is not able to perform, on a full-time basis, the major duties of his or her own job." AR at 85. The policy defines "own job" as "[a] covered person's job for the employer." AR at 87. The policy also requires that a claimant establish that she became disabled while insured by the policy and remained disabled throughout the elimination period. AR at 80. Plaintiff must also be under a doctor's regular care for the cause of her disability and Plaintiff must submit written proof of her disability. *Id.*

Guardian grounds its decision to deny Plaintiff disability benefits in Plaintiff's failure to establish that she became disabled while insured by the policy. (Doc. No. 24 at 21.) Guardian asserts that Plaintiff made no mention of her back condition in her initial resignation letter, and that none of Plaintiff's medical records at the time of her resignation on April 20, 2007 suggested that her back condition required her to leave work. *Id.* However, Plaintiff contends that she was

12

disabled at the time of her resignation because she was unable to perform the duties of her job and her condition would require chronic absences. (Doc. No. 22 at 15.) Plaintiff also contends that Dr. Heiges' consistent opinion has been that she is disabled and that this opinion has not been contradicted by any other doctor. *Id.*

The Court finds that it was not unreasonable for Guardian to deny Plaintiff disability benefits because Plaintiff did not establish that she became disabled while insured by the policy. Plaintiff initially submitted a resignation letter stating she would be resigning on May 1, 2007 so that she and her husband could move to Tennessee to be closer to her family. On April 20, 2007, she suddenly terminated her employment early, stating that a pre-existing back condition prevented her from working, making her claim for disability benefits on the same day. Although she claimed that her doctor suggested she leave work immediately, nothing in the medical record supports this assertion. It is uncontested that Plaintiff was seeing Dr. Heiges prior to her resignation. However, Dr. Heiges's own notes prior to Plaintiff's resignation make no mention of Plaintiff's need to resign due to her back condition. In fact, Dr. Heiges's stated in his notes that he believed the issue would likely resolve with some time. Further, the doctor noted just two days prior to Plaintiff's resignation on April 20 that Plaintiff had significant relief from a SI injection and would only return if her symptoms returned. Dr. Heiges' subsequent conclusion some months later, that Plaintiff was disabled as of April 20, 2007 is contrary to his own notes in Plaintiff's medical records.

As supported by Dr. Heiges' notes in Plaintiff's medical record, this Court finds that Guardian's determination that Plaintiff was not disabled as of her resignation on April 20, 2007 was not arbitrary and capricious. Furthermore, because Plaintiff was not found to be disabled prior to her date of resignation, her insurance under the Plan terminated on April 20, 2007.

Additionally, because her insurance terminated on April 20, any subsequent determination that Plaintiff was disabled is irrelevant. Thus, this Court finds that Guardian's determination that Plaintiff was not eligible to receive disability benefits under the Plan was not arbitrary and capricious.

**b. Guardian properly considered the medical evidence**

Plaintiff contends that Guardian did not properly consider all of the medical evidence and improperly relied on its own reviewing nurse. (Doc. No. 22.) She claims that Guardian relied too heavily on her initial resignation letter and Dr. Heiges' notes after Plaintiff's SI injection and did not give proper consideration to the statements contained in her employer's records that she had to stop working because of her back pain. *Id.*

This Court finds that Guardian's reliance on the medical record was not improper. The statements by Plaintiff's employer that Plaintiff was resigning early because of back pain were not a medical opinion, nor were they reliable evidence that Plaintiff was in fact disabled. The statements of Mrs. Phillips' employer, contained in the Notice of Separation, were merely documenting the reason Plaintiff herself gave for her resignation on April 20. Plaintiff's own assertion that she was disabled does not make it so, and neither do any statements to this effect documented by her employer. Guardian determined this evidence was not reliable and instead focused on the medical record from Plaintiff's visit with Dr. Heiges prior to her resignation, concluding that the medical record did not support Plaintiff's assertion that she was disabled.

Furthermore, Plaintiff contends that Guardian ignored evidence in her favor and did not give her a full and fair review to which she is entitled under ERISA. (Doc. No. 22 at 19.) ERISA does require that a plan administrator conduct a full and fair review of all evidence, including the opinions of treating physicians. *See* 29 U.S.C. § 1133. However, ERISA does not

require plan administrators to accord special deference to the opinions of treating physicians, particularly where there is credible, reliable evidence that conflicts with the treating physicians' opinions. *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 824-25 (2003).

Guardian did not ignore evidence in favor of Plaintiff. Instead, Guardian's reviewing nurse evaluated the evidence and determined the report of Mark Boatner and Dr. Heiges' 2008 sworn statement, which indicated that Plaintiff was disabled, were in conflict with the medical record and Dr. Heiges' own prior statements. Guardian determined that the medical record did not indicate that Dr. Heiges found Plaintiff's back condition required her to resign on April 20, 2007. Guardian is not required to give Dr. Heiges subsequent medical opinion deference, especially when his own notes taken at the time he was treating Plaintiff contradicted this opinion. Additionally, upon review of Dr. Klara's office notes and Mr. Boatner's report, Guardian found that nothing in this evidence indicated that Plaintiff was disabled as of April 20, 2007. Guardian was not unreasonable in its determination to give more weight to the statements made by Dr. Heiges and the medical record at the time Plaintiff resigned than to the months-later opinions of the two physicians and Mr. Boatner.

Further, Guardian's reliance on the non-examining nurse does not in itself require a conclusion that Guardian acted improperly. *See Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 295 (6th Cir. 2005). Plaintiff contends that Guardian exclusively relied on the nurse's medical opinion. However, Guardian relied on the nurse's medical opinion as well as Dr. Heiges's own statements from Plaintiff's medical record prior to April 20, 2007. Dr. Klara's and Mr. Boatner's report only provide evidence of a disability several months after Plaintiff's resignation, while Dr. Heiges' own notes taken during his examination of Plaintiff prior to her resignation do not indicate that Plaintiff was unable to perform the duties of her job. Plaintiff was required to

15

prove she was disabled prior to her resignation. Guardian's decision to accord more weight to the medical evidence of Plaintiff's condition and the treating physician's statements at the time she resigned was reasonable. Guardian's decision was not arbitrary and capricious, taking into consideration the impact of the limited conflict of interest created by Guardian's incentive scheme for claim handlers. Ample evidence in the record supports Guardian's decision.

Furthermore, because Guardian's denial of short-term disability benefits was reasonable, Guardian properly denied review of long-term disability benefits. Both short-term disability and long-term disability benefits require the Plaintiff to be disabled while insured under the Plan. AR at 78, 91. Although the long-term disability policy does not require the Plaintiff to receive short-term disability benefits first, they both require the same disability finding. Therefore, Guardian in effect determined Plaintiff was not eligible for long-term disability benefits when it determined she was not disabled as defined by the Plan.

## IV. CONCLUSION

As set forth above, the Court finds that Defendant's determination that Plaintiff was not disabled while insured under the Plan was not arbitrary and capricious and must be upheld. Accordingly, Defendant's Motion for Judgment on the Administrative Record is **GRANTED** and Plaintiff's Motion for Judgment on the Administrative Record is **DENIED**.

It is so ORDERED.

Entered this the ____25th_____ day of March, 2011.

JOHN T. NIXON, SENIOR JUDGE
UNITED STATES DISTRICT COURT